## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## PINE BLUFF DIVISION

**BRANDON FRITTS**                                                                  **PLAINTIFF**
**#1084818**

**v.**                              **No: 5:16-cv-00141 DPM-PSH**

**WENDY KELLEY,** *et al.*                                                        **DEFENDANTS**

## PROPOSED FINDINGS AND RECOMMENDATION

## INSTRUCTIONS

The following recommendation has been sent to Chief United States District

Judge D.P. Marshall Jr.  You may file written objections to all or part of this

recommendation.  If you do so, those objections must: (1) specifically explain the

factual and/or legal basis for your objection, and (2) be received by the Clerk of this

Court within fourteen (14) days of this recommendation.  By not objecting, you may

waive the right to appeal questions of fact.

## DISPOSITION

## I.  Introduction

Plaintiff Brandon Fritts, a former inmate at the Varner Super Max Unit

(VSM)[1] of the Arkansas Department of Correction (ADC), filed a *pro se* complaint

---

[1] Fritts was transferred to the New Jersey State Prison in March 2017.  *See* Doc.
No. 52.  His case had previously been closed based on his failure to update his address.

on May 5, 2016, and amended complaints on May 31 and October 11, 2016, raising due process and equal protection claims. *See* Doc. Nos. 1, 5, 9 & 19. The original complaint named as defendants ADC Director Wendy Kelley, ADC Deputy Director Dale Reed, VSM Warden Randy Watson,[2] and a number of Does, identified as members of the VSM Director Review Committee and VSM Classification Committee. They were sued individually and in their official capacities. Doc. No. 1 at 2. Fritts later added as defendants VSM Classification Officer F. Washington and VSM Deputy Wardens Curtis Meinzer, Moses Jackson, Jeremy Andrews, B. Inman, and C. Budnik, and identified them as members of the VSM Classification Review Committee and/or Director Review Committee.[3] Doc. No. 19 at 22-24. Fritts filed an addendum to his amended complaint on January 6, 2017, adding an Eighth Amendment conditions of confinement claim. *See* Doc. Nos. 39, 45 & 46. Fritts' official capacity claims were subsequently dismissed, and Fritts' due process,

His case was reopened on April 5, 2017 (Doc. No. 53). The Court appointed Misty Wilson Borkowski as counsel for Fritts on October 1, 2018 (Doc. No. 89). Alexander Dylan Clark also serves as counsel for Fritts (Doc. No. 95).

[2] According to Watson's affidavit, he was the Superintendent at Varner/Varner Supermax during the time periods relevant to this lawsuit and is now the Superintendent at the Wrightsville Unit. *See* Doc. No. 137-4 at 1. The titles Warden and Superintendent appear to be used interchangeably.

[3] Fritts later clarified that these defendants are the same as the Doe defendants. *See* Doc. Nos. 72 & 73.

equal protection, and conditions of confinement claims were allowed to proceed. *See* Doc. Nos. 40 & 45.

Fritts claims that his due process rights were violated because he was held in administrative segregation at VSM for a little more than four years without meaningful reviews.  Doc. No. 1 at 14.  Fritts also claims that he was treated differently than other inmates who were gang-affiliated and had gang-related violent rule violations.  Doc. No. 1 at 5; Doc. No. 19 at 3.  He claims those other inmates who were similarly situated were not kept in long term administrative segregation. *Id.*  Finally, Fritts contends that the defendants violated his right to be free from cruel and unusual punishment by instructing him to renounce his gang affiliation in order to obtain release to the general population.  Doc. No. 46.  He claims that doing so would have placed him in great danger. *Id.*

The defendants filed a redacted motion for summary judgment, a brief in support, and a statement of undisputed facts (Doc. Nos. 107-109), and also an amended motion that attached exhibits that are not filed under seal (Doc. No. 110). The defendants subsequently re-filed their motion, brief in support, and statement of undisputed facts under seal with additional exhibits (Doc. Nos. 114 – 116).  Fritts filed a response, brief in support, and response to the defendants' statement of undisputed facts (Doc. Nos. 123-125), and the defendants filed a reply (Doc. No. 127).

After reviewing the parties' submissions, the undersigned ordered the parties to supplement the record with evidence pertinent to:

(1)    the administrative segregation review process, including what information about Fritts was available to the committee, director, and warden during Fritts' reviews and what information the committee members, director, and warden considered during Fritts' reviews; and

(2)    the conditions Fritts faced while in administrative segregation and how those conditions differed from the conditions in general population.

Doc. No. 133.    The Court also ordered the parties to clarify Fritts' Eighth Amendment claim.    The parties have since supplemented the record with the requested information, Doc. Nos. 137, 139 & 140, and the motion is ripe for consideration.

The defendants' statement of facts, and the other pleadings and exhibits in the record, establish that the material facts are not in dispute and that the defendants are entitled to judgment as a matter of law.

## II. Legal Standard

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(a); *Celotex v. Catrett*, 477 U.S. 317, 321 (1986).  When ruling on a motion for

summary judgment, the court must view the evidence in a light most favorable to the nonmoving party. *Naucke v. City of Park Hills*, 284 F.3d 923, 927 (8th Cir. 2002). The nonmoving party may not rely on allegations or denials, but must demonstrate the existence of specific facts that create a genuine issue for trial. *Mann v. Yarnell*, 497 F.3d 822, 825 (8th Cir. 2007). The nonmoving party's allegations must be supported by sufficient probative evidence that would permit a finding in his favor on more than mere speculation, conjecture, or fantasy. *Id.* (citations omitted). An assertion that a fact cannot be disputed or is genuinely disputed must be supported by materials in the record such as "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . .". FED. R. CIV. P. 56(c)(1)(A). A party may also show that a fact is disputed or undisputed by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case. *Othman v. City of Country Club Hills*, 671 F.3d 672, 675 (8th Cir. 2012). Disputes that are not genuine or that are about facts that are not material will not preclude

summary judgment. *Sitzes v. City of West Memphis, Ark.*, 606 F.3d 461, 465 (8th Cir. 2010).

### III. Facts[4]

#### *Fritts' 2012 Incarceration at the ADC*

Fritts reentered the ADC in June 2012 to serve a ten-year sentence following revocation of his parole due to a shooting charge. Exhibit O, *Deposition of Brandon Fritts,* at 21-22; Exhibit P, *Fritts' Pen Pack & Status Assignment Sheets,* at 32.[5] Fritts' incarceration in 2012 was his third incarceration in the ADC. Exhibit O, *Deposition of Brandon Fritts,* at 13. Fritts' convictions include breaking and entering, theft of property, commercial burglary, residential burglary, first degree battery, second degree battery, possession of a firearm, first degree terroristic threatening, and aggravated assault.[6] Exhibit P at 2-9. During a prior incarceration,

---

[4] The facts are taken from those submitted by the parties which are supported by documentary evidence and sworn testimony (Doc. Nos. 110-1 – 110-6 & 114 (sealed); Doc. No. 123; Doc. Nos. 137 & 139). Disputed facts are noted. There is no document number reference for exhibits filed by defendants under seal; accordingly, all of defendants' exhibits are referred to by the letter assigned by defendants' counsel.

[5] Exhibit P is a sealed exhibit. Because there are no document numbers for the sealed exhibits, the Court refers to the page numbers at the bottom of the exhibit. There are no pages 10-20 in this exhibit.

[6] Fritts disputes the relevance of his criminal history. *See* Doc. No. 124 at 1-4. Although there is no evidence in this record that the defendants considered all of Fritts' criminal history during his administrative segregation reviews, the Court includes a brief summary of that history to provide background and context.

Fritts attacked prison guard Sherry Conrad and pleaded guilty to second degree battery.  Exhibit T (Doc. No. 137-4), *Affidavit of Randy Watson,* at 5-6; Exhibit R (Doc. No. 137-2), *Amended Information*.

While Fritts was awaiting trial on a first-degree murder charge in 2012 (presumably the same shooting charge that caused his parole revocation), he was incarcerated at the Sebastian County jail where he stabbed another inmate.  Exhibit P at 9; Exhibit O at 20-22.  He was then moved to the ADC pending his first-degree murder trial.  Exhibit O at 22.

Upon his return to the ADC in June 2012, he was initially assigned to the Ouachita River Unit and was later transferred to the Tucker Unit.  Exhibit P at 32. On June 18, 2012, Fritts was placed in a Security Threat Group (STG).[7]  Exhibit C, *Offender Separation Alerts* and *Inmate Precautions,* at 14.

In August 2012, Fritts was found guilty of murder and received a life sentence. Exhibit P at 9.  After his conviction and sentencing, Fritts was moved to the East Arkansas Regional Unit (EARU), a higher security prison.  *Id.* at 10.  Fritts remained in the general population at EARU until October 9, 2012, when he was placed into investigative status[8] and assigned to administrative segregation according to his

---

[7] Security threat groups are described in the following section.

[8] Fritts denies that any investigation occurred.  Doc. No. 124 at 16.  Because Fritts does not sue regarding his time in administrative segregation at the EARU, the circumstances concerning his placement there are immaterial to this lawsuit.  His time in administrative segregation at the EARU, however, is added to his time in administrative

status assignment sheet.  *Id.* at 31.  Fritts' STG file record dated October 17, 2012 identifies Fritts as a Captain in the Aryan Circle, a known member of its Upper Board, and the highest-ranking Aryan Circle member in Arkansas.[9]  Exhibit K, *Fritts' STG File Record*.  Fritts was transferred to the VSM on December 6, 2012. Exhibit P at 30.

### Relevant ADC Policies and Procedures

The ADC's Administrative Directive 10-25 establishes policies and guidelines related to Security Terrorist/Threat Groups (STTGS).[10]  Exhibit D, *Administrative Directive 10-25*.  It defines a STTG as "any group of inmates that the Department of Correction reasonably believes poses a threat to the security of the institution and/or the physical safety of other inmates or staff by virtue of the group's

---

segregation at the VSM for purposes of determining whether he had a liberty interest in avoiding administrative segregation.  *See Chestang v. Varner Super Max*, 496 Fed. Appx. 684, 686 n.1 (8th Cir. 2013) (per curiam) (segregation at separate facilities should be aggregated for purpose of due process inquiry); *Williams v. Norris*, 277 F. App'x 647, 648 n. 1 (8th Cir. 2008) (citing *Giano v. Selsky,* 238 F.3d 223, 226 (2d Cir. 2001)) ("separate segregation sentences should be aggregated for purposes of due process inquiry when they constitute sustained period of confinement").

[9] Fritts denies that his STG file record confirms anything other than a defendant or other ADC employee wrote the information in his STG file.  Doc. No. 124 at 6.  In response to interrogatories, Defendant Wendy Kelley stated that Fritts "continued to be involved in STTG activity as a high-ranking member. You were not simply a member, but directed and instigated STTG activity."  Exhibit M at 6.  Plaintiff denies that he "directed activity." Doc. No. 124 at 6.

[10]  The acronyms STTG and STG (Security Threat Group) appear to be used interchangeably.

nature and/or activities. *Id.* at 1-2. The unit administration is responsible for maintaining awareness at the unit level by disseminating relevant information to staff with respect to STTG affiliation. *Id.* at 2. Unit personnel suspecting an inmate of being a member of a STTG shall submit any substantiating evidence to the unit STTG coordinator with relevant documents attached. *Id.* at 2-3. The Unit STTG coordinator will submit substantiated information to the Unit Classification Committee (the "Committee") to ensure that inmates affiliated with designated STTGs are properly and accurately identified. *Id.* at 3. STTG affiliation may be established by several means, including self-identification, known STTG tattoos, known STTG paraphernalia, information received from outside law enforcement agencies, information from ADC's Internal Affairs, information received from confidential informants, inmate correspondence, inmate telephone system recordings, and STTG pictures. *Id.* All STTG members are to assigned housing according to the Department of Correction classification policy and at the discretion of the Warden/Center Supervisor.[11] *Id.* at 5. The ADC's STTG policy provides for the creation and maintenance of STTG files. *Id.* at 5-6. STTG files are to be kept

---

[11] In sworn answers to interrogatories, defendants Watson, Kelley, and Reed acknowledge that it is not the policy or practice of the ADC to assign to or retain inmates in administrative segregation solely based on the inmate's STTG-affiliation; that inmates in general population are STTG-affiliated; and that it is not the practice or policy of the ADC to require inmates in administrative segregation to renounce their STTG affiliation in order to be released from administrative segregation. Exhibit L at 7-8; M at 4; N at 5.

in a locked cabinet, and only certain prison officials have access to those files.  *Id.*
at 6.

The ADC's inmate classification policy is set forth in Administrative
Directive 16-27.  That policy provides that inmates are classified by a committee
established for that purpose.[12]  Exhibit E, *Administrative Directive 16-27,* at 1.  The
purpose of the inmate classification system is to manage inmates from the time of
conviction to release in an effort to meet the needs of the inmate, the correctional
system, and the public.  Exhibit E at 1.  The Committee conducts periodic reviews
of all inmates to assess progress made by the inmate and can adjust, as needed, class
status and other matters recommended by staff.  *Id.* at 2.  Classification actions may
include class promotion, job assignments, custody level increases/decreases,
assignment to or removal from segregation, and verification of re-entry plans.  *Id.*
The Committee may consider a number of factors when making classification
decisions, including history of violence, detainers, current offense, length of
sentence, disciplinary reports, prior arrest/commitments, notoriety, FBI Rap Sheet,
staff judgment, responsibility (shown by inmate), involvement in alcohol/drug use,

---

[12] The Committee generally consists of the: (1) Warden/Assistant Warden
(chairperson); (2) Chief of Security or designee; (3) Classification Officer; (4) Mental
Health Personnel; and (5) Medical representative.  Doc. No. 137-3, *Affidavit of Floria
Washington*.

peer groups and associates, respect toward staff/others, and facility security. *Id.* at

2-3. *See also* Exhibit T (Doc. No. 137-4), *Affidavit of Randy Watson*, at 2.

Administrative Directive 15-02 contains the ADC's class status and

promotion eligibility policy. Exhibit F, *Administrative Directive 15-02*. ADC policy

places inmates in a class status commensurate with custody considerations and

programmatic goals. It also establishes criteria for class promotion, reclassification,

and/or restoration of lost good time. *Id.* at 1. Class I is the highest classification.

*Id.* Class I has several subcategories including Class 1C which is for all inmates

assigned to Class I status who are required to have armed security supervision when

working outside the fence. *Id.* at 2. Class II is required for an inmate to be

considered for restoration of lost good time, and is typically required for enrollment

in a treatment program. *Id.* All inmates are assigned Class II upon intake unless the

inmate is being returned as the result of disciplinary action and has been reduced

below Class II status. *Id.* Class III status is the lowest class status that earns any

good time, and would typically indicate an inmate has had behavioral problems

within the unit. *Id.* at 3. Class IV is the lowest class status, indicating the inmate

has been found guilty of disciplinary violations and is not eligible to earn any good

time. *Id.*

To appear before the Committee for class promotion or reclassification, an

inmate must have a favorable institutional record. *Id.* at 5. A minimum of 60 days

from the date of the inmate's last major disciplinary hearing is required, or if the inmate received punitive time, then the 60-day time period begins upon the inmate's release from punitive. *Id.* at 5-6. *See also* Exhibit G, *Administrative Directive 11-62,* at 1. Once the Committee has approved a reclassification or promotion, then the inmate must maintain a favorable institutional record for at least 30 days before appearing before the Committee for another promotion or reclassification. Exhibit F at 6; Exhibit G at 3.

Administrative Directive 14-07 contains the ADC's administrative segregation policy. That policy aims to provide secure, safe housing to inmates who require a higher degree of physical control or who staff otherwise find necessary to remove from the general population of the facility. Exhibit H, *Administrative Directive 14-07.* Pursuant to the ADC's administrative segregation policy, the Committee, or in any emergency, the Warden/Center Supervisor, may place an inmate in administrative segregation if his continued presence in the general population poses a serious threat to life, property, self, staff, or other inmates. *Id.* at 1. In addition, inmates who threaten the security or orderly running of the institution may be segregated. *Id.* The policy provides that inmates are to be afforded a meaningful hearing before the Committee before being placed in segregation. *Id.* The inmate is to receive written notification of the hearing and is allowed to appear before the Committee to make any statement and to present documentary evidence,

including witness statements. *Id.* at 2. Determinations concerning administrative segregation are made by a majority vote of the Committee. *Id.* The inmate will be advised of the reasons for his/her administrative assignment to segregation in writing, and a copy of the reasons will be maintained in the inmate's electronic file. *Id.* All decisions are subject to review and approval by the Warden or his/her designee. *Id.*

While assigned to administrative segregation, inmates are allowed the following controls and privileges:

1. Housing in a separate area of the institution determined by the Warden.

2. Work duties within the limits of the inmate's medical classification.

3. Regularly scheduled meals – may be served in cells.

4. Televisions and/or radio privileges may be denied.

5. Institutional activities as approved by the Warden.

6. Regular mail privileges.

7. Chaplaincy will visit the administrative segregation area regularly and upon request.

8. Visits may be in a separate visiting room and will be conducted in the presence of an officer.

9. The opportunity to shave and shower a minimum of three times per week. Barbering and hair care services should be available on the same basis as general population. Exceptions are

permitted when found necessary by the senior officer on duty. All exceptions will be recorded in the log and justified in writing.

10.    [Weekly shaving opportunities.]

11.    Referrals to medical, dental, or mental health services through sick call or for medical emergencies.

12.    Opportunity for exercise, a minimum of one hour per day five (5) days per week, unless security or safety dictates otherwise. Opportunities to exercise outdoors, weather permitting. Reasons for the imposition of any restraints should be documented. Inmates who have out-of-cell work assignments are not required to receive the one-hour exercise period.

13.    Permitted commissary orders – which will be delivered to the segregation unit.

14.    Appropriate clothing is to be issued.

15.    A reasonable amount of reading material and educational material approved by the Educational Department.

16.    Bedding is to be changed weekly and weekly laundering services are to be provided.

17.    Access to law materials upon request and in accordance with unit policy.

18.    Access to the inmate's attorney of record via legal mail and telephone.

19.    Inmates leaving or entering the segregation unit must be thoroughly searched. They shall be escorted by two officers and under normal circumstances will be in restraints to and from their destination.

*Id.* at 2-3.

Once an inmate is assigned to administrative segregation, the Committee is to review his status every seven days for the first 30 days. *Id.* at 4. Thereafter, the Committee will review the inmate's status every 30 days to determine if the reasons for placement continue to exist. *Id.* At every other 30-day review, the inmate will be personally interviewed by the Committee or authorized staff. *Id.* Classification reviews are documented utilizing the appropriate segregation form. *Id.* If an inmate remains in administrative segregation for one year, then he is personally interviewed by the unit Warden at the end of one year. *Id.* At the end of the second and each additional year that an inmate remains in segregation, he is personally interviewed by both the Warden and the Deputy/Assistant Director, who will determine whether continuation of the inmate's status is necessary and/or appropriate. *Id.*

In addition to Administrative Directive 14-07, the Varner Unit (which includes the VSM) has a policy concerning "Special Management Inmates," which includes inmates assigned to administrative segregation. Exhibit I, *VU 10.5.0.* According to VU 10.5.0, administrative segregation is defined as a "form of separation from the general population administered by the classification committee when the continued presence of the inmate in the general population would pose a serious threat to life, property, self, staff, or other inmates, or to the security of the unit or its orderly operation." *Id.* at 1. Inmates may be assigned to administrative segregation for several reasons, including:

1.      Chronic inability to adjust in the general population.

2.      Inmates pending transfer or holdover status awaiting permanent housing assignment as determined by the Classification Committee.

3.      An inmate having been found guilty of taking over a part of the physical plant, battery, aggravated battery, rape, or forced sexual assault, taking of a hostage, or any act defined as felonies or misdemeanors by the State of Arkansas.

4.      Any behavior or circumstances, which pose a serious threat to the security, good order, or quality of life for staff or inmate of the institution, will warrant consideration for assignment to Administrative Segregation.

5.      The inmate is potentially dangerous to himself or others.

. . .

*Id.* at 2.  An inmate may be released from administrative segregation, if: (1) the condition which required placement in administrative segregation no longer exists; or (2) information demonstrates that the inmate no longer presents a danger to himself or others.  *Id.*

Inmates in administrative segregation are housed in a single occupancy cell with no less than 80 square feet of floor space and 35 square feet of unencumbered space.  Exhibit I at 2-3.   In addition to the privileges outlined in Administrative Directive 14-07, inmates in administrative segregation at VSM are also afforded non-contact visitation and access to barber and hair care services on a scheduled basis.  *Id.* at 3-4.  Other privileges such as access to reading materials, religious texts,

recreation, programs and services, cleaning supplies, mental health counselors, and the law library and legal counsel are outlined in the policy. *Id.* at 3-6.

### *Fritts' Time in VSM Administrative Segregation*

Fritts was assigned to VSM administrative segregation on December 19, 2012. Exhibit P at 30. He remained in segregation until he was transferred on February 9, 2017. *Id.* at 21. Fritts does not dispute that he received all of his 30-day and 60-day hearings while housed in segregation. Exhibit O at 39; Doc. No. 124 at 19. He was transferred to the New Jersey State prison in March 2017 where he was initially placed in the general population until he stabbed another inmate.[13] Doc. No. 124 at 51-52.

The following chart summarizes the reviews, class promotion hearings, offender separation alerts,[14] inmate precautions, and the 12 disciplinaries[15] that Fritts

---

[13] The Court does not consider Fritts' actions after his transfer to New Jersey in determining whether his confinement in administrative segregation at VSM violated his constitutional rights.

[14] Fritts' institutional file maintained by the ADC contains numerous active offender separation alerts. Exhibit C at 1-11. Those separations refer to inmates housed at seven different units, including Varner Supermax. *Id.* at 15. One separation states that the inmate filed the separation because he left a gang and the gang members threatened to assault him when he enters prison. *Id.* at 4.

[15] The chart on page 1 of Exhibit B lists 14 disciplinaries, but two entries appear to be duplicates.

received while he was housed in administrative segregation at VSM.[16]  *See* Exhibit A, *November 2012-January 2017 Administrative Segregation Review Forms*; Exhibit B, *Plaintiff's Disciplinary History;* Exhibit C, *Offender Separation Alerts and Inmate Precautions*.  The chart lists the date of review, the type of review, and the reason noted for the decision made in the segregation reviews or class promotion hearings.  Disciplinaries are shaded a light gray while offender separation alerts and inmate precautions are shaded a darker gray.   Unless noted, the Committee unanimously voted to maintain Fritts in segregation at each review.

| Date | Type of Review | Notice Action/Reason |
|------|----------------|----------------------|
| 12/26/2012 | 7-day | Inmate is a threat to the security and good order of the institution; other:  inability to function in Varner population at this time.  Exhibit A at 8. |
| 1/2/2013 | 7-day | Inmate is a threat to the security and good order of the institution; other:  needs closer supervision.  *Id. at 9.* |
| 1/9/2013 | 7-day | Inmate is a threat to the security and good order of the institution.  *Id.* at 10. |
| 1/16/2013 | 7-day | Inmate is a threat to the security and good order of the institution; other:  needs closer supervision. *Id.* at 11. |
| 1/23/2013 | 7-day | Inmate is a threat to the security and good order of the institution; other:  needs closer supervision.  *Id.* at 12 |
| 1/30/2013 | 7-day | Other:  inmate needs closer supervision.  *Id.* at 13. |

---

[16] Fritts denies that the offender separation alerts, inmate precautions or STG affiliations are material to his claims.  Doc. No. 124 at 5-10.  Although the offender separation alerts and inmate precautions were never listed as a factual basis for retaining Fritts in administrative segregation, Fritts' STG affiliation was listed on many review forms.  Additionally, Classification Officer and Committee Member Floria Washington and Warden/Superintendent Watson submitted affidavits (described below) in which they testified that the Committee considered Fritts' institutional history at every review.  *See* Doc. No. 137-3 at 6.

| Date | Type of Review | Notice Action/Reason |
|------|----------------|----------------------|
| 2/5/2013 | 7-day | Other:  inmate needs closer supervision.  *Id.* at 14. |
| 2/13/2013 | 7-day | Inmate is a threat to the security and good order of the institution; other:  can't function in Varner population at this time; SGT affiliated.  *Id.* at 15. |
| 2/20/2013 | 60-day | The Committee voted unanimously to consider Fritts for "possible release."  *Id.* at 16.  Warden Randy Watson referred that decision back to the Committee, citing Fritts' disciplinary history as the reason.  *Id.* According to Fritts' disciplinary records, he had not received a disciplinary since April 2010 at that time.  Exhibit B at 1. |
| 2/28/2013 | Disciplinary | Officer James Chaney conducted a strip search of Fritts and reported that officers located a black AT&T Samsung cellular phone inside a pocket in Fritts' boxer shorts.  Exhibit B at 6.  Following the search, Fritts was charged with and found guilty of several ADC rule violations and was sentenced to 30 days punitive isolation and reduced to Class IV status.  *Id.* at 6-9.  He also lost commissary and visitation privileges for 60 days and phone privileges for 365 days.  *Id.*  Fritts waived his attendance at the hearing.  *Id.* at 7.  Fritts testified that did so because he "was caught red-handed."  Exhibit O at 50. |
| 3/7/2013 | Inmate Precaution | Cell phone violator.  Exhibit C at 14. |
| 3/20/2013 | 30 day | Inmate is a threat to the security and good order of the institution; other:   remain Class IV need to regain class.  Exhibit A at 17. |
| 4/1/2013 | Offender Separation Alert | Inmate "revealed that he has voluntarily removed him self [sic] from the Aryan Circle STG affiliation and has requested the inmates listed [including Fritts] to be placed on his enemy alert  because of the threat of harm issued to him by the Aryan Circle members."  Exhibit C at 7. |
| 4/2/2013 | Offender Separation Alert | "The mailroom at EARU intercepted a letter written to inmate Brandon Fritts #120999 who is housed at VSM.   In the letter the inmate |

| Date | Type of Review | Notice Action/Reason |
|---|---|---|
| | | discussed smashing and taking care of [inmate no. 1] who is also housed at VSM.  The letter also mentioned [inmate no. 2] who is housed at VSM.  I would suggest that you watch inmate [no. 1] closely as the Aryan Circle appears to have a hit out on him."[17]  *Id.* at 8. |
| 4/17/2013 | 60 day | Other:  Recent cellphone possession;  active gang affiliation.  Exhibit A at 18. |
| 5/15/2013 | 30 day | Inmate is a threat to the security and good order of the institution; other:  remain Class IV need to regain class.  *Id.* at 19. |
| 6/12/2013 | 60 day | Other:  Active STG affiliation.  *Id.* at 20. |
| 7/10/2013 | 30 day | Inmate is a threat to the security and good order of the institution; other:  remain Class IV need to regain class.  *Id.* at 21. |
| 8/7/2013 | 60 day | Other:  STG affiliation.  *Id.* at 22. |
| 9/4/2013 | 30 day | Inmate must regain Class II before being considered for release; other:  active STG affiliation.  *Id.* at 23. |
| 10/2/2013 | 60 day | STG affiliated (active).  *Id.* at 24. |
| 10/30/2013 | 30 day | Inmate is a threat to the security and good order of the institution; other:  remain Class IV need to regain class.  *Id.* at 25. |
| 11/15/2013 | Disciplinary | Fritts was accused of mailing Aryan Circle materials to an individual in Texas.  Exhibit B at 9.  Fritts pleaded not guilty and denied any involvement.  *Id.* at 10.  Fritts was found guilty of several rule violations, including a rule violation related to a STG, and sentenced to 30 days punitive isolation and reduced to Class IV.  *Id.*  He also lost commissary, phone, and visitation privileges for 60 days.  *Id.* |
| 11/19/2013 | Disciplinary | Fritts was accused of using third party sources to send STTG related materials (including Aryan Circle |

---

[17] Fritts admits the content of the separation but denies its accuracy.  Doc. No. 124 at 9.  He points out that despite the severity of this allegation, he was not issued a Major Disciplinary for the purported conduct and it was not documented as a basis for his continued confinement in administrative segregation.  *Id.*

| Date | Type of Review | Notice Action/Reason |
|------|----------------|----------------------|
|  |  | recruitment activities and the group's bylaws) and information pertaining to illegal activities to other inmates within the ADC.  Exhibit B at 11.  Fritts pleaded not guilty and denied any involvement. *Id.* at 12.  Fritts was found guilty of several rule violations, including a rule violation related to a STG, and sentenced to 30 days punitive isolation and reduced to Class IV.  *Id.*  He also lost commissary, phone, and visitation privileges for 60 days.  *Id.* |
| 11/27/2013 | 60-day | Fritts waived participation. Chronic inability to comply with agency rules and regulations and is a threat to the agency mission. Exhibit A at 26. |
| 12/11/2013 | Disciplinary | Allegation that Fritts attempted "to manipulate the mail to send STTG-related (Aryan Circle specific) contraband mail" to another ADC inmate and a federal inmate and to set up illegal activities with other inmates and/or free world parties.  Exhibit B at 14-17. Fritts pleaded not guilty and denied any involvement.  *Id.* at 15.  Fritts was found guilty of several rule violations and sentenced to 30 days punitive isolation. *Id.* at 15-16.  He lost commissary, phone, and visitation privileges for 60 days. *Id.* at 16. |
| 12/27/2013 | 30-day | Threat to the security and good order of the institution; must regain Class II before being considered for release; and active STTG affiliation and activity.  Exhibit A at 27. |
| 1/22/2014 | 60-day | No reason listed.  *Id.* at 28. |
| 2/20/2014 | 30-day | Continues to pose a threat to the security and good order of the institution; active STTG affiliation. *Id.* at 29. |
| 2/20/2014 | Disciplinary | Allegation that Fritts used the mail system to "send unauthorized STTG-related letters to known and/or suspected STTG-contraband related addresses through the use of communicative cloaking techniques designed to evade detection . . . ".  Exhibit B at 18-20.  The time for processing the disciplinary expired, and a not guilty verdict was entered.  *Id.* |

| Date | Type of Review | Notice Action/Reason |
|---|---|---|
| 3/26/2014 | 60-day | Fritts requested to be transferred to another facility. Continues to pose a threat to the security and good order of the institution; active STTG affiliation; Class III. Exhibit A at 30. |
| 4/4/2014 | Disciplinary | Allegation that Fritts refused to comply with a strip search and instead retrieved a plastic baggie containing a red substance believed to be homemade liquor and poured it into the toilet. Exhibit B at 21-23. The report alleges that Fritts refused orders to stop and submit to restraints. *Id.* Fritts pleaded not guilty. *Id.* at 23. He was found guilty of several rule violations and sentenced to 30 days punitive isolation and a class reduction to Class IV. *Id.* |
| 4/16/2014 | Offender Separation Alert | "Due to both inmates being high ranking members in Arkansas Aryan Circle and [other inmate] attempted to contact Inmate Fritts while on Back up list." Exhibit C at 9. |
| 4/23/2014 | 30 day | Inmate is a threat to the security and good order of the institution; other:  Class IV punitive/STTG Active Affiliation.  Exhibit A at 31. |
| 5/21/2014 | 60 day | Fritts waived appearance.  Inmate is a threat to the security and good order of the institution; other: Class IV; STTG Affiliation. *Id.* at 32. |
| 6/18/2014 | 30 day | Inmate is a threat to the security and good order of the institution; other:  Class IV; STTG Affiliation. *Id.* at 33. |
| 7/16/2014 | 60 day | Inmate is a threat to the security and good order of the institution; other:  active STTG Affiliation. *Id.* at 34. |
| 8/12/2014 | Possible Class Promotion | Promotion to Class III; Inmate is a threat to the security and good order of the institution; other: remain STTG Affiliated. *Id.* at 35. |
| 8/13/2014 | 30 day | Inmate is a threat to the security and good order of the institution; other:  Class IV; STTG Affiliation. *Id.* at 36. |
| 9/10/2014 | 30 day | Inmate is a threat to the security and good order of the institution; other:  Class IV; STTG Affiliation. *Id.* at 37. |

| Date | Type of Review | Notice Action/Reason |
|---|---|---|
| 9/17/2014 | Possible Class Promotion | Promotion to Class II; Inmate is a threat to the security and good order of the institution; other: Inability to function in Varner Unit population. *Id.* at 38. |
| 9/19/2014 | Offender Separation Alerts | "Varner Fusion Center has received information that Inmate Quick is to attempt to kill this inmate during an upcoming trial date."[18] Exhibit C at 10-11. |
| 10/8/2014 | 60 day | Class II; Inmate is a threat to the security and good order of the institution; other: Inability to function in Varner Unit population. Exhibit A at 39. |
| 10/22/2014 | Possible Class Promotion | Promotion to Class 1C; Inmate is a threat to the security and good order of the institution; other: Inability to function in Varner Unit population. *Id.* at at 40. |
| 10/30/2014 | Disciplinary | Allegation that staff searched Fritts' cell and found a nine-inch-long piece of lexan sharpened to a point on one end along with notes containing STTG related information and information about assaults on other inmates. Exhibit B at 24-26. Fritts pleaded not guilty. *Id.* at 25. Fritts was found guilty of several rule violations, including a rule violation related to a STG, and sentenced to 30 days punitive isolation and a class reduction to Class IV. *Id.* at 26. |
| 10/31/2014 | Disciplinary | After another search of Fritts' property, Fritts was issued a major disciplinary alleging that Fritts intended to lace pills with harmful additives to cause another inmate serious injury or death. *Id.* Fritts pleaded not guilty. *Id.* Fritts was found guilty of several rule violations, including a violation related to STG, and sentenced to 30 days punitive isolation and a class reduction to Class IV. *Id.* at 28-29. He also lost commissary, phone, and visitation privileges for 60 days. *Id.* |

---

[18] It is not clear if Fritts was the intended victim or why the inmate alert was entered in his file. Two other inmates are listed as the offenders. Exhibit C at 10-11.

| Date | Type of Review | Notice Action/Reason |
|------|----------------|----------------------|
| 11/5/2014 | 30-day | Continues to pose a threat to the security and good order of the institution. "Remain STTG affiliation . . . [illegible] Class IC." Exhibit A at 41. |
| 12/4/2014 | Director's Review; 60-day | Fritts was reported as saying "I have had 6 disciplinar[ie]s in 5 yrs. I can't get a job. I can't go to population."[19] *Id.* at 42. Continues to pose a threat to the security and good order of the institution; active STTG affiliation. *Id.* |
| 12/12/2014 | Warden's Review | Fritts requested a transfer, and Warden Randy Watson advised Fritts that his name was placed on the transfer list. *Id.* at 43. |
| 12/17/2014 | Inmate Precautions | Dangerous Gang Member.  Exhibit C at 14. Comments:  "due to intel received that Inmate Fritts has been calling shots to have Inmates & staff stabbed and beaten."[20] *Id.* at 12-13. "Inmate Fritts is a known member of the Upper Board in Aryan Circle.  He is the highest ranking Aryan Circle member in Arkansas." *Id.* at 12. |
| 12/30/2014 | Disciplinary | Varner Field Force and Utility staff conducted an investigation into STTG material located in the cell of another inmate and concluded that Fritts authored and trafficked STTG material related to the Aryan Circle. Exhibit B at 30.  Fritts was then issued a major disciplinary charging him with several rule violations. *Id.*  Fritts pleaded not guilty and stated: "I did not |

---

[19] The defendants' statement of facts states that Fritts and Director Reed discussed his institutional history at the December 2015 Director's review and cites Fritts' deposition in support of that statement.  Doc. No. 124 at 43.  The portion of the deposition cited by defendants concerned the December 2014 director's review, not the December 2015 review.  *See* Exhibit O at 68-70.  Fritts acknowledged that the director listened but believed it to be a formality.

[20] Fritts admits the Inmate Precaution includes this language; he denies that it is accurate information.  *See* Doc. No. 124 at 7.  Fritts point out that there is no indication in the December 12, 2014 Warden's Review or his ADC-maintained disciplinary record that Plaintiff was ordering the battery of other inmates.  *Id.*  The defendants point out that Fritts received two disciplinaries in October 2014 relating to gang activity and threats on other inmates.  *See* Doc. No. B at 24-29.

| Date | Type of Review | Notice Action/Reason |
|------|----------------|----------------------|
| | | know anything about this. . . . inmate Kaufamn said he wrote this . . .". *Id.* at 31. Fritts was found guilty of several rule violations, including a violation related to STG, and sentenced to 30 days punitive isolation and a class reduction to Class IV. *Id.* at 31-32. He also lost commissary privileges for 60 days. *Id.* |
| 1/3/2015 | Disciplinary | Allegation that Fritts misused the telephone system to discuss Aryan Circle STTG related information and to pass STTG-related messages. Exhibit B at 33. Fritts pleaded not guilty to two charges and stated: "I did try to pass messages. I was not doing anything illegal." *Id.* at 34. Fritts was found guilty of several rule violations and sentenced to 30 days punitive isolation and a class reduction to Class IV. *Id.* at 34. He also lost commissary and visitation privileges for 60 days and phone privileges for 365 days. *Id.* |
| 1/28/2015 | 60-day | Fritts requested to be transferred and was advised that his name was on the transfer list. Continues to pose a threat to the security and good order of the institution; Class IV/Punitive. Exhibit A at 44. |
| 2/3/2015 | Disciplinary | Allegation that Fritts had a homemade handcuff key inside a canvas shoe. Exhibit B at 35. Fritts pleaded not guilty but waived his attendance at the hearing. *Id.* at 36. He was found guilty and sentenced to 30 days punitive isolation, loss of commissary, phone, and visitation privileges for 30 days, and a class reduction to Class IV. *Id.* |
| 2/9/2015 | STG File Record Entry | "This inmate is the current Vice President for AC in the ADC." Exhibit K. |
| 2/26/2015 | 30 day | Inmate is a threat to the security and good order of the institution; other:  Remain STTG affiliation. Exhibit A at 45. |
| 3/25/2015 | 60 day | Inmate is a threat to the security and good order of the institution; other: Inability to adjust to population. *Id.* at 46. |

| Date | Type of Review | Notice Action/Reason |
|---|---|---|
| 4/22/2015 | 30 day | Inmate is a threat to the security and good order of the institution; other: STG Affiliation. *Id.* at 47. |
| 5/21/2015 | 60 day | Inmate is a threat to the security and good order of the institution; other: Inability to function in population. *Id.* at 48. |
| 6/17/2015 | 30 day | Inmate is a threat to the security and good order of the institution; other: remain in ad/seg due to STG Affiliation. *Id.* at 49. |
| 7/2/2015 | Possible Class Promotion | Promotion to Class III. Inmate is a threat to the security and good order of the institution. *Id.* at 50. |
| 7/16/2015 | 60 day; Class Promotion | Promotion to Class II. Inmate is a threat to the security and good order of the institution. *Id.* at 51. |
| 8/12/2015 | 30 day | Inmate is a threat to the security and good order of the institution; other: remain in ad/seg due to STG Affiliation. *Id.* at 52. |
| 8/15/2015 | Possible Class Promotion | Promotion to Class IC. Inmate is a threat to the security and good order of the institution. *Id.* at 53. |
| 9/9/2015 | 60 day | No action/reason given. *Id.* at 54. |
| 10/5/2015 | 30 day | Inmate is a threat to the security and good order of the institution; other: Received Class 1C. *Id.* at 55. |
| 11/5/2015 | 60 day | Inmate is a threat to the security and good order of the institution; other: transfer list. *Id.* at 56. |
| 12/2/2015 | 30 day | Inmate is a threat to the security and good order of the institution; other: STG affiliation. *Id.* at 57. |
| 12/2/2015 | Warden's Review | Fritts told the Committee, "I am trying to get out. I have left all the STG stuff alone. I have been locked down for 3 years." *Id.* at 58. He was told he would be seen at the Director's review. *Id.*<br>Inmate is a threat to the security and good order of the institution; STTG. *Id.* |
| 12/9/2015 | Director's Review | Dale Reed and the Committee conducted the Director's review.[21] *Id.* at 59. A note (presumably on |

---

[21] The review form indicates that Fritts stated he had completed an 18-month program. *Id.* Fritts acknowledged in his deposition that he had not completed an 18-

| Date | Type of Review | Notice Action/Reason |
|------|----------------|----------------------|
| | | the back of the form) indicates that Fritts said, "I have been doing everything I can to do right.  I had some status in the gang. I murdered another criminal. I done that 4 years ago." *Id.* at 60.  Fritts admits the accuracy of the review form.  Doc. No. 124 at 42.<br>Inmate is a threat to the security and good order of the institution; Inability to function in VU population.  Exhibit A at 59. |
| 12/28/2015 | 60 day | No action/reason given. *Id.* at 61. |
| 1/27/2016 | 30 day | Remain on ad/seg due to STG affiliation. *Id.* at 62. |
| 2/22/2016 | Disciplinary | Sergeant Frankie Brooks charged Fritts with several rule violations after reviewing emails from Fritts that contained information related to Aryan Circle STTG activity.  Exhibit B at 37.  Although the disciplinary issued by Brooks was referred to a hearing officer, the hearing records are not included in Exhibit B.  *Id.* at 37-38.    However, Fritts' status assignment sheet indicates a major disciplinary was finalized on March 2, 2016.  Exhibit P at 22.  According to the status assignment sheet, Fritts was sentenced to punitive isolation for 30 days and his class was reduced to Class IV. *Id.* |
| 2/24/2016 | 60 day | Note on form states:  "DW Budnik spoke [illegible] Inmate Fritts about ongoing gang activity.  I gave my life to this.  I told Mr. Andrews I wouldn't get staff hurt.  I'm not perfect but I have been laid back.  Why are you keeping me locked down?   Give me a chance."  Exhibit A at 63.<br>Inmate is a threat to the security and good order of the institution. *Id.* |
| 3/23/2016 | 30 day | Inmate is a threat to the security and good order of the institution; other:   Remain due to active gang affiliation. *Id.* at 64. |
| 4/27/2016 | 60 day | Inmate is a threat to the security and good order of the institution. *Id.* at 65. |

month program since 2006; Fritts stated he did not know why that was on the form.  Exhibit O at 112-13.

| Date | Type of Review | Notice Action/Reason |
|------|----------------|----------------------|
| 5/25/2016 | 30 day | Remain due to active gang affiliation. *Id.* at 66. |
| 5/31/2016 | Possible Class Promotion | Promotion to Class III.  Inmate is a threat to the security and good order of the institution. *Id.* at 67. |
| 6/21/2016 | 60 day | Inmate is a threat to the security and good order of the institution. *Id.* at 68. |
| 7/5/2016 | Possible Class Promotion | No promotion indicated on form.[22]  Inmate is a threat to the security and good order of the institution; can't function in population. *Id.* at 69. |
| 7/20/2016 | 30 day | Inmate is a threat to the security and good order of the institution; STG affiliation. *Id.* at 70. |
| 8/9/2016 | 60 day; Class Promotion | Promotion to Class IC.  Inmate is a threat to the security and good order of the institution. *Id.* at 71. |
| 9/7/2016 | 30 day | Inmate is a threat to the security and good order of the institution; other:  Remain in ad/seg due to STG affiliation. *Id.* at 72. |
| 10/4/2016 | 60 day | Inmate is a threat to the security and good order of the institution. *Id.* at 73. |
| 11/2/2016 | 30 day | Inmate is a threat to the security and good order of the institution; other:  disciplinary history STTG affiliation. *Id.* at 74-75. |
| 12/6/2016 | Director's Review | Notes from the December 6, 2016 director's review indicate that Fritts admitted he had made some mistakes as reflected in his institutional jacket. Exhibit A at 76-77.  Fritts stated, "I had a bunch of stupid things in my jack.  I apologize for that.  That is one of the stupid things that I have done. I was on the upper board of the AC." *Id.*  Fritts requested to be transferred out of state and was advised that the director would check on it. *Id.;* Exhibit N at 6. |

---

[22] Although no promotion is indicated on the review form, Fritts' status assignment sheet shows that he was promoted to Class II on July 5, 2016.  Exhibit P at 22.

| Date | Type of Review | Notice Action/Reason |
|------|------|------|
| | | Inmate is a threat to the security and good order of the institution; other:  inability to function in population.  Exhibit A at 76. |
| 12/13/2016 | Warden's Review; 60 day | No action/reason listed.  *Id.* at 78. |
| 1/4/2017 | 30 day | Other:  SGGT leader/Transfer list.  *Id.* at 79. |

### *Affidavit of Fiona Washington*

The defendants submitted the affidavit of defendant Floria Washington in support of their motion for summary judgment.  Exhibit S (Doc. No. 137-3), *Affidavit of Floria Washington*.  Her testimony is summarized in this section.

Washington has served as VSM's Classification Officer since 2010.  *Id.* at 1. In that role, Washington schedules inmates for classification review hearings and gathers the documentation necessary to review an inmate's classification and/or custody status.  *Id.*  She also participates as a member of the Committee and documents statements made during the hearings and the summaries of the hearings. *Id.*  Washington was the classification officer for all of Fritts' classification reviews, and has personal knowledge of the classification hearings and the documents submitted in support of the defendants' motion for summary judgment.  *Id.* at 22-23. The Committee determined that Fritts required a higher physical control due to his institutional record, and that his continued assignment to administrative segregation

was appropriate because he could not be safely housed in the general population.  *Id.*
at 23.

Fritts received his first Administrative Segregation Review at VSM on
December 12, 2012, and he was initially recommended to be placed in administrative
segregation because he posed a threat to the security and good order of the
institution.  *Id.* at 3.  The Committee determined that Fritts should be held over for
possible assignment, meaning that additional information would be acquired before
determining Fritts' status.  *Id.* (The review form from that review is not in evidence
and therefore not included in the chart above.)

During the thirty-day reviews an inmate receives while held in administrative
segregation, the Committee's members are able to review the inmate's entire
institutional record, including any past disciplinary history.  *Id.* at 4.  The Committee
chairperson and classification officer review the inmate's institutional file by pulling
up and reviewing the inmate's electronic file maintained in eOMIS (Electronic
Offender Management Information System) during the review.  *Id.*  The retrieved
information is shared with the other Committee members, who are also able to view
the electronic record during the review.  *Id.*  The Committee gives particular
consideration to any disciplinaries the inmate has received since his last review, any
documentation regarding the inmate's interaction with staff, precautions, and any
other information placed in the inmate's institutional record.  *Id.* at 4-5.  The

Committee is also able to review any inmate precautions, including STTG information, during the review.  *Id.*  With respect to Fritts, the Committee also considered his class status, demeanor when addressing the Committee, and cooperation with the Committee.  *Id.* at 7-8.  Fritts did not always display a good attitude during Committee hearings, and he once wrote Washington a letter apologizing for his behavior.  *Id.* at 22.

Because all STTG file information is included in an inmate's file on eOMIS, the Committee was aware that, as of October 17, 2012, Fritts was a confirmed leader in the Aryan Circle and a "known member of the Upper Board in Aryan Circle, and the highest-ranking Aryan Circle member in Arkansas."  Exhibit S at 5 (citing Exhibit K, *Fritts' STG File Record*).  The Committee would also have been aware that Fritts was believed to be the current Vice President for Aryan Circle in the ADC on February 9, 2015.  *Id.* at 5-6.  The Committee reviewed Fritts' history of offender separations and precautions at every review to ensure that inmates are not assigned to housing areas, job assignments, or facilities with a known enemy or victim.  *Id.* Accordingly, the Committee was aware of the various precautions and separations described in the chart above.  Because Fritts' custody score was C-49, he could only be housed at a C-4 or C-5 unit which are the highest custody units in the ADC.  *Id.* at 22.  Fritts had inmate separation alerts for every C-4 or C-5 unit with the exception of the Cummins Unit.  *Id.*

According to Washington, some members of the Committee were aware that Fritts had assaulted a prison guard during a previous incarceration and had received a disciplinary relating to that attack. Exhibit S at 7. The Committee was also aware of each of the disciplinaries Fritts received during his stay in administrative segregation, all of which are described in the chart above. *Id.* at 8-21. The Committee was aware of any demotions to class and whether Fritts was currently serving punitive time. *Id.* Fritts' institutional record demonstrated that he was not merely affiliated with a gang but showed that he was actively involved in prohibited STTG and illegal activity. *Id.* at 11. Contrary to Fritts' allegations, the Committee never ordered Fritts to renounce his gang affiliation in exchange for release from administrative segregation. *Id.* at 23. Fritts' active involvement with gang activity and resulting disciplinaries were properly considered by the Committee in determining whether Fritts continued to pose a threat to safety and security. *Id.*

### *Affidavit of Randy Watson*

The defendants submitted the affidavit of defendant Randy Watson in support of their motion for summary judgment. Exhibit T (Doc. No. 137-4). His testimony is summarized in this section.

Watson was the Superintendent/Warden at VSM during the time periods relevant to this lawsuit, and is currently the Superintendent of the Wrightsville Unit. *Id.* at 1. Watson has been employed by the ADC for 36 years. *Id.* Watson's

responsibility as Warden/Superintendent included reviewing the Committee's recommendations, and approving the recommendations or referring them back to the Committee for further action or consideration. *Id.* Watson also conducted the annual Warden's review for inmates who were in administrative segregation for at least a year. *Id.*

Watson is familiar with Fritts and was aware of his institutional history, including the disciplinaries he received and intelligence on his involvement with the Aryan Circle. *Id.* at 1 & 5. Watson was also aware of Fritts' inmate precautions and STTG activity. *Id.* at 6.

In accordance with the prison's policy on STTGs, *Administrative Directive 10-25, supra,* Watson received information concerning Fritts' STTG activities while he was incarcerated at VSM. *Id.* at 4. The STTG coordinator for VSM was responsible for forwarding a monthly report of all STTG activities to him and the ADC's Internal Affairs STTG coordinator. *Id.* This report includes the names of inmates recently identified as members of STTG groups, as well as any monthly intelligence developed at the unit concerning incidents or individuals. *Id.* STTGs are taken very seriously at the ADC, and STTG intelligence is submitted to federal and state task forces, the ADC's internal affairs administrator, and the Chief Deputy Director. *Id.* Unit staff persons, such as the Deputy Warden, Chief of Security, and other correctional personnel, provided Watson with information received during

investigations concerning STTG activities, contraband, drugs, and weapons in the regular course of business.  *Id.* at 4-5.

Watson stated that during classification review hearings, an inmate's entire institutional record is available for the committee to review, and the committee conducting Fritts' reviews would have reviewed and considered Fritts' disciplinary history, inmate precautions, enemy alert notifications, STTG activity and involvements, investigations, and any other information found on eOMIS.  Exhibit T at 3.  Watson reviewed the Committee's recommendations for Fritts from 2013 through 2016.  *Id.* at 4.  The one time that the Committee referred Fritts for release to general population, Watson referred that decision back to the Committee after reviewing Fritts' disciplinary history.  *Id.*  Fritts' prior disciplinary history was extensive, and he had been transferred to the VSM from another maximum security unit based on concerns related to Fritts' STTG activity and for the safety of other inmates.  *Id.*  Watson believed Fritts needed to be observed in a more secure environment to determine whether or not he posed a threat to security.  *Id.*  Watson also was aware that Fritts had previously committed an assault and battery on a female Varner Unit employee, who was still employed at the Varner/VSM units at that time.  *Id.* at 4-5.  Within days of Watson's referral back to the Committee, Fritts received a major disciplinary for possession of a cell phone.  *Id.*

At the time of Fritts' 2013 warden's review, Watson was aware that Fritts was Class IV and assigned to punitive isolation because he had received four major disciplinaries for serious rule violations, including active involvement in STTG incidents and illegal activities. Exhibit T at 6.

Watson was also present at Fritts' warden's review and director's review in 2014. *Id.* at 7. At that time, Fritts had received eight major disciplinaries while assigned to administrative segregation. *Id.* Fritts' institutional history at that time demonstrated that he was a threat to the safety and security of the institution. *Id.* Watson states:

> It was particularly troubling to me that Fritts continued to engage in very serious rule violations while assigned to a more restrictive environment. This conduct demonstrated to me that, if given an opportunity, Fritts would continued [sic] to engage in equally serious, if not more egregious conduct if housed in a lesser controlled environment.

*Id.* at 7-8. Watson found two disciplinaries that Fritts received in October 2014 compelling. *Id.* at 8. One was for possession of a nine-inch homemade knife, sharpened to a point and hidden in Fritts' property bag. *Id.* Notes directing the assault of inmates housed in general population were also found in Fritts' cell; these notes indicated that inmates seeking membership in the Aryan Circle were to assault other inmates who were named in the notes. *Id.* The notes explicitly discussed stabbing specific inmates in the neck and where the attacks were to occur. *Id.* Fritts

had also been charged with planning to harm or kill another inmate by giving him pills laced with a corrosive. *Id.*

Watson attended Fritts' warden's and director's reviews in December 2015. Exhibit T at 10. By that time, Fritts had accrued four more disciplinaries, including one for being in possession of a homemade handcuff key. *Id.*

At his warden's and director's reviews in December 2016, Fritts acknowledged his poor institutional history. Exhibit T at 11. Fritts had also received another disciplinary for using the ADC's email system to engage in STTG activity. *Id.* The Deputy Director agreed to follow up on Fritts' request for a transfer during the director's review. *Id.*

Fritts' gang affiliation was not the sole cause of his continued segregation. Exhibit T at 9. Fritts' segregation continued because Fritts continued to direct STTG activity as a high-ranking member of the Aryan Circle while he was assigned to administrative segregation. *Id.* Watson points to Fritts' STTG file, which indicated he was a dangerous gang member who was "calling shots" to have other inmates stabbed and beaten. *Id.* at 10. His segregation also continued based on the disciplinary charges that Fritts had attempted to orchestrate assaults on inmates in general population and that Fritts had used the mail and phone to attempt to commit tax fraud and other illegal activities. *Id.* at 9. Prison officials did not request or direct Fritts to renounce his affiliation in the Aryan Circle, and did not inform Fritts

that he would be transferred to general population in exchange for such renunciation. *Id.* In sum, Fritts was retained in administrative segregation because of his repeated disciplinary violations, danger to inmates and staff, and chronic inability to follow the ADC's rules and regulations. *Id.*

As the Warden, Watson had a responsibility to all inmates to ensure that they are being housed in the safest manner possible. Exhibit T at 8. Based on the Committee's review of Fritts' institutional record, including his disciplinary history, the Committee concluded that Fritts posed a serious danger to staff and inmates housed in general population at the Varner Unit. *Id.* at 8-9. Watson says that based on his many years of experience, it was reasonable to conclude that if assigned to general population, Fritts would continue to direct and recruit members into STTG activity that included drugs and violence against other inmates and staff. *Id.* at 9. Eventually, the Committee agreed to determine whether Fritts could be transferred to another facility, but it was difficult to find another facility to take him based on his custody score, disciplinary history, inmate precautions, enemy alerts, and available bed space. *Id.* Fritts was ultimately transferred to New Jersey via the interstate compact system. *Id.* at 11.

### Conditions in Administrative Segregation Compared to General Population

In his complaint, Fritts generally described the conditions he endured while in administrative segregation at Varner. Doc. No. 19 at 14. Fritts also filed a sworn

declaration in opposition to the defendants' motion for summary judgment describing the conditions in administrative segregation and the general population at VSM.  Doc. No. 140-1.  Fritts' declaration testimony is summarized in this section.

In administrative segregation, Fritts was confined to a small concrete cell with a solid door that had a "pass-through" in order to deliver items to him.  *Id.* at 4.  To reduce the number of times an inmate could leave the cell, the cell had a bed, shower, and toilet affixed to the cell's wall.  *Id.* Fritts received one hour of recreation five time a week, but was shackled and escorted to an outdoor cell with solid concrete walls for his recreation time.  *Id.*  The outdoor cell was covered with metal screening and an awning above the screening.  *Id.*  Nearly all sunlight was blocked from getting into the outdoor cell, and birds would sit and/or construct nests on the covering above the cell, which resulted in bird feces regularly falling inside the already cramped cell.  *Id.*  In the spring, eggs from hatching birds would fall in the cell, and, at times, baby birds would fall out of the nest and their dead bodies would be in the cell.  *Id.*

Fritts described the procedure by which he was allowed to leave the cell as follows.  Each time he exited the cell, which was infrequent, he was required to strip completely naked, while officers visually inspected him.  Doc. No. 140-1 at 4.  He then put his boxers back on, but passed the rest of his clothes through the pass-through in the cell door.  *Id.*  Fritts was then instructed to back up to the door and place his hands in the pass-through so that an officer could place handcuffs on his

wrists.  *Id.*  He was then required to step to the back of the cell, get on his knees on his bed facing the back of the cell, and cross his legs.  *Id.*  Officers would then enter his cell and place leg restraints on him so that he could be escorted by officers.  *Id.*  Fritts wore hand and leg restraints at all times outside of his cell. *Id.*

Fritts claims that he had little to no human interaction or communication on a regular basis.  Doc. No. 140-1 at 4.  He ate all meals in his cell, alone, and food was delivered to him on a tray through the pass-through in his door.  *Id.* at 5.  All visitations were no-contact visitations, and he was not permitted to participate in any religious services while housed in administrative segregation although he believes the Chaplain was supposed to visit inmates that desired to meet with him once a week.  *Id.*  Fritts does not say that he requested to meet with the chaplain.

Fritts also describes the conditions in general population at the Varner Unit when he was confined there in 2009-10.  Doc. No. 140-1 at 1.  Inmates in general population live in open barracks, where each barrack holds approximately 50 other men who are supervised by two guards in a control booth.  *Id.* at 1-2.  While in general population, Fritts stayed in a two-level barrack that held 25 men on a lower level and 25 men on an upper level.  *Id.* at 2.  Inmates were free to move about the entire barrack and socialize with other inmates in the barrack.  *Id.*  Inmates in the barracks were not placed in any sort of physical restraints, according to Fritts.  *Id.*

Fritts further explains that each inmate in Varner general population was assigned his own bed and a footlocker to store personal belongings. Doc. No. 140-1 at 2. Inmates were required to be in their beds at "lights out," which is 10:30 p.m. Sunday through Thursday, and 2:00 a.m. on Friday and Saturday. *Id.* at 4. Before lights out, however, inmates could move freely about the barrack, watch television, or engage in any other appropriate and available activity. *Id.*

Fritts states that the barrack where he lived in Varner's general population had a "day room" which contained a television that played movies, a television that played cable/network shows, and a television that played sports exclusively. Doc. No. 140-1 at 2. Benches were located in front of each television for the inmates to sit on while watching the televisions. *Id.* The televisions were controlled by the inmates, who decided what to watch by majority vote. *Id.* Inmates generally had free access to telephones, regular and electronic mail, and commissary. *Id.* Inmates could also use the showers and bathroom facilities whenever necessary. *Id.* Inmates were generally permitted to leave the barracks and go to the chapel to participate in religious services two times per week. *Id.* at 3.

Fritts further states that inmates in Varner's general population received at least an hour of outside recreation seven days a week, and, at times, received multiple hours a day of outside recreation. Doc. No. 140-1 at 2-3. He claims that at times the entire Varner general population would have outside recreation together, and

sometimes the population would be split in half and alternate outside recreation time. *Id.* The outside recreation area was a large, open area with no roof, screen, or other barrier covering it. *Id.* at 3. Inmates were provided adequate and appropriate equipment and space to do calisthenics or play sports, including softball, basketball, flag football, volleyball, horse shoes, a running track, soccer, and handball. *Id.* If the weather did not permit inmates to have outside recreation, they were permitted to go to the gymnasium for indoor recreation, which contained basketball, multi-fitness machines, table tennis, and body building equipment, jump ropes, speed bag, and body bag. *Id.*

Fritts also states that all inmates in Varner general population have a job, or work assignment, unless medically restricted. Doc. No. 140-1 at 3. Fritts worked construction and field utility or the hoe squad while housed in Varner's general population. *Id.* Inmates with work assignments generally worked from approximately 7 a.m. to 3 – 4 p.m. and stayed busy for most of the workday. *Id.*

In his deposition, Fritts acknowledges that he suffered no physical injuries as a result of his time in administrative segregation in VSM, but maintains he suffered mental and psychological harm. Exhibit O at 99; Doc. No. 124 at 52. Washington testified in her affidavit that Fritts did not complain to the Committee that his continued assignment in administrative segregation caused him medical or mental health problems. Exhibit S (Doc. No. 137-3) at 23. She also notes that the

Committee has one member who is a medical and mental health representative who had access to Fritts' medical and mental health records and could have provided information concerning Fritts' mental health to the Committee or voted to release him from administrative segregation. *Id.* at 23-24. Superintendent Watson also states in his affidavit that a member of the mental health staff was present at every Committee hearing, and no member of the medical or mental health staff opined that Fritts' continued assignment to administrative segregation resulted in any medical or mental health concern. Exhibit T (Doc. No. 137-4) at 13-14.

Superintendent Watson states in his affidavit that inmates in administrative segregation at VSM are afforded essentially the same services that general population inmates receive. Exhibit T at 12-13. The only difference is most services, such as meals, are brought to the inmate and the inmate does not live in an open barrack with other inmates. *Id.* Watson notes that Fritts' assignment to administrative segregation had no effect on the duration of his sentence; he is serving a life sentence but could still receive class promotions and earn good time while in administrative segregation. *Id.* at 13. He notes that any class reductions Fritts received were due to disciplinaries he received, and not due to his assignment to administrative segregation. *Id.*

# IV. Analysis

The defendants assert that they are entitled to qualified immunity with respect to Fritts' remaining individual capacity claims.[23] Qualified immunity protects government officials from liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person [in their positions] would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). Qualified immunity is a question of law and is appropriately resolved on summary judgment. *McClendon v. Story County Sheriff's Office*, 403 F.3d 510, 515 (8th Cir. 2005); *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). To determine whether a defendant is entitled to qualified immunity, the Court must consider two questions: (1) do the facts alleged by plaintiff establish a violation of a constitutional or statutory right; and (2) if so, was that right clearly established at the time of the defendant's alleged misconduct.[24] *Wright v. United States*, 813 F.3d 689, 695 (8th Cir. 2015).

> For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S.

---

[23] The defendants do not brief qualified immunity but raise it in their motion. *See* Doc. No. 114.

[24] In applying qualified immunity, the Eighth Circuit Court of Appeals subscribes to "a broad view of the concept of clearly established law, and we look to all available decisional law, including decisions from other courts, federal and state, when there is no binding precedent in this circuit." *Turner v. Arkansas Ins. Dep't*, 297 F.3d 751, 755 (8th Cir. 2002); *Vaughn v. Ruoff*, 253 F.3d 1124, 1129 (8th Cir. 2001).

635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful." *Id.* (citing *Mitchell v. Forsyth,* 472 U.S. 511, 535 n. 12, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)). "But it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Id.* (citations omitted). Petitioners can show a clearly established right through "cases of controlling authority in their jurisdiction at the time of the incident" or through a "consensus of cases of persuasive authority such that a reasonable officer could not have believed that his actions were lawful." *Wilson v. Layne,* 526 U.S. 603, 617, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999). The pertinent inquiry is whether the state of the law at the time gave the official "fair warning" that such conduct was unlawful in the situation he confronted. *Hope v. Pelzer,* 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002); *Saucier v. Katz,* 533 U.S. 194, 202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).

*Wright,* 813 at 695-96. Courts may exercise "their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

### A.    *Due Process Claim*

To prevail on a Fourteenth Amendment Due Process claim, a prisoner "must first demonstrate that he was deprived of life, liberty, or property by government action." *See Phillips v. Norris,* 320 F.3d 844, 846 (8th Cir. 2003). Fritts was not deprived of life or property; accordingly, he must identify the deprivation of a liberty interest to sustain a due process challenge to his assignment to administrative segregation. *Id.* at 847; *Sandin v. Conner*, 515 U.S. 472, 484 (1995). "In order to determine whether an inmate possesses a liberty interest, we compare the conditions

to which the inmate was exposed in segregation with those he or she could 'expect to experience as an ordinary incident of prison life.'" *Phillips*, 320 F.3d at 847 (quoting *Beverati v. Smith*, 120 F.3d 500, 503 (4th Cir. 1997)). The Eighth Circuit Court of Appeals has interpreted *Sandin* to mean that a prisoner's due process rights are implicated only when there have been "deprivations which work such major disruptions in a prisoner's environment and life that they present dramatic departures from the basic conditions and ordinary incidents of prison sentences." *Moorman v. Thalacker,* 83 F.3d 970, 972 (8th Cir. 1996).

An inmate generally has no liberty interest in avoiding segregated confinement and the suspension of privileges, because such punishment does not create an "atypical and significant" hardship. *Phillips*, 320 F.3d at 847; *Portly-El v. Brill*, 288 F.3d 1063, 1065 (8th Cir. 2002). However, the Eighth Circuit has recognized that there may be limits to this general rule, and a lengthy period of time in segregation may amount to an atypical and significant hardship. *See Williams v. Norris*, 277 Fed. Appx. 647, 648 (8th Cir. 2008) (unpublished per curiam) (approximately 12 years in administrative segregation was atypical and significant hardship); *Herron v. Schiro*, 11 Fed. Appx. 659, 661-62 (8th Cir. 2001) (unpublished per curiam) (more than thirteen years in administrative segregation results in an atypical hardship). *See also Wilkinson v. Austin,* 545 U.S. 209, 224 (2005) (in class action, inmates' placement in solitary confinement at Ohio's Supermax facility with

almost no human contact, dim lighting for 24 hours a day, and one hour of exercise per day in a small indoor room constituted an atypical and significant hardship due to indefinite duration with only annual reviews and the preclusion of parole eligibility).

If an inmate has a liberty interest in avoiding segregation, the due process clause requires periodic review of an inmate's placement in administrative segregation at regular intervals and annual meetings with a warden. These reviews must be "meaningful," and must ensure that the prison is not using administrative segregation as a pretext for indefinite confinement. *Williams v. Norris*, 277 Fed. Appx. 647 (8th Cir. 2008); *Rahman X v. Morgan*, 300 F.3d 970 (8th Cir. 2002); *Jones v. Mabry*, 723 F.2d 590 (8th Cir. 1983); *Kelly v. Brewer*, 525 F.2d 394 (8th Cir. 1975).

The defendants argue that Fritts' four plus years in administrative segregation was not an atypical and significant hardship because it is significantly less time than the 10-13 years at issue in the *Williams* or *Herron* cases. The defendants also point out that Fritts spent nearly one year in punitive isolation as a result of disciplinary convictions[25] so that he was only in administrative segregation a little more than three years.

---

[25] Those disciplinary convictions and punitive sentences are not challenged in this case.

Fritts asserts that the Eighth Circuit's unpublished opinion *Chestang v. Varner Super Max,* 496 F. App'x 684 (8th Cir. 2013), establishes that a four-year stay in administrative segregation implicates a liberty interest.  In that case, the District Court granted the defendants' motion to dismiss and found that Chestang had not alleged sufficient facts to show that his two-year placement in a behavior modification program constituted a significant and atypical hardship based on the restrictions placed on him there.  *Chestang v. Varner Super Max*, No. 5:11-CV-00225-SWW, 2012 WL 1118415, at *3 (E.D. Ark. Feb. 28, 2012), *report and recommendation adopted sub nom. Chestang v. Varner Super Max*, No. 5:11-CV-00225-SWW, 2012 WL 1112483 (E.D. Ark. Apr. 3, 2012).  The District Court also found that Chestang's subsequent seven-month stay in administrative segregation was not sufficient to state a liberty interest given existing case law and Chestang's failure to allege any specific conditions in administrative segregation that might be considered an atypical and significant hardship.  *Id.*  The Eighth Circuit reversed the dismissal.  496 Fed. Appx. at 686.  The Court noted that Chestang had alleged that he faced similar restrictions in both the behavior modification program and administrative segregation.  *Id.* at n. 1.  Taking those allegations as true, the Court found that Chestang's continued segregation for several years implicated a liberty interest sufficient to state a due process claim.  *Id.* at 686.

On remand, the District Court considered evidence provided by the defendants and granted summary judgment in their favor. *Chestang v. Varner Super Max Classification Comm.*, No. 5:11CV00225-SWW-JJV, 2014 WL 37789, at *5 (E.D. Ark. Jan. 6, 2014); *report and recommendation adopted,* No. 5:11CV00225-SWW-JJV at Doc. No. 111. The District Court determined that Chestang did not suffer an atypical and significant hardship in the behavior modification program, that its restrictions were not similar to those he endured while in administrative segregation, and that plaintiff had failed to specify any conditions that might be atypical and significant other than the length of time he spent in administrative segregation. *Id.* The District Court also found that Chestang received meaningful reviews while he was in administrative segregation. *Id.* The Eighth Circuit subsequently affirmed the grant of summary judgment on the basis that "defendants demonstrated with unrebutted evidence that Chestang received the process he was due while confined in administrative segregation, . . .". *Chestang v. Varner Super Max*, 571 Fed. Appx. 511 (8th Cir. 2014). The Eighth Circuit did not reach the issue of whether Chestang had proven that he suffered a sufficient hardship to demonstrate a liberty interest. Accordingly, the *Chestang* opinion stands for the proposition that a near four-year stay in a restrictive program and/or administrative segregation is sufficient to state a due process claim for purposes of pleading, but not that such a lengthy stay

*necessarily* implicates a liberty interest once evidence of the conditions are considered.

The cases that reach the merits of whether a significant amount of time in segregation infringes on a liberty interest focus on the conditions an inmate faces in segregation.[26]  If the conditions do not differ significantly from those the inmate would normally endure, a longer stay in segregation is less likely to implicate a liberty interest.  For instance, in *Rahman X v. Morgan*, 300 F.3d 970, 973 (8th Cir. 2002), the Eighth Circuit found that the plaintiff (a death-row inmate) could not establish that his liberty interest was curtailed by a 26-month stay in administrative segregation.  The Court stated:

> Although the length of time he was kept in a segregation cell was substantial, he was not subject to the hardships that prisoners placed in that ward for punitive reasons face.  For example, he was allowed out of his cell for recreation for three hours per week, the same amount of time that prisoners housed in death-row cells were allowed, whereas this privilege was not available to prisoners on punitive status.  The main hardship that Mr. X seems to identify that he suffered that inmates housed on death-row did not was an inability to watch television in his cell.  This is not a significant hardship, even when combined with the other minor deprivations Mr. X alleges.

---

[26] *See e.g., Crow v. Fabian,* No. CIV. 08-3350 PJS/FLN, 2010 WL 2464865, at *7 (D. Minn. Feb. 5, 2010), *report and recommendation adopted*, No. 08-CV-3350 PJS/FLN, 2010 WL 2301006 (D. Minn. June 4, 2010) ("Federal courts have frequently found that segregated confinement lasting nearly a full year, or even longer, does not constitute the type of hardship that gives rise to a protected liberty interest.") (and cases cited therein).

*Id.* at 973–74.  Likewise, in *Jordan v. Fed. Bureau of Prisons*, 191 Fed. Appx. 639, 652 (2006), the Tenth Circuit Court of Appeals found that a prisoner failed to establish a liberty interest in avoiding segregated confinement for a period of five years where "inmates segregated in administrative maximum confinement experience restrictions and conditions comparable to those of general population inmates, with the exception of one less social call per month and possibly seven hours less recreation time per week, depending on the different recreation classes within the general population."  *Id.*  However, the prisoner in *Jordan* was also the subject of a pending murder investigation, and the court found that the ongoing investigation as well as the prison's knowledge of his "significant history of violent and disruptive behavior" provided "sufficient extenuating circumstances" to find that his liberty interests were not implicated.[27]  *Id.*

---

[27] In *Jordan,* the Tenth Circuit stated:

We have also determined that "[t]he due process rights of prisoners are subject to reasonable limitation or restriction in light of the legitimate security concerns of the institution," and therefore, "'the transfer of an inmate to less amenable and more restrictive quarters for nonpunitive reasons is well within the terms of confinement ordinarily contemplated by a prison sentence.'" *Penrod v. Zavaras,* 94 F.3d 1399, 1406 (10th Cir. 1996) (citation omitted). In this case, Mr. Jordan's administrative detention was a result of a justified, ongoing criminal investigation of which prison officials were aware. They were also cognizant of Mr. Jordan's significant history of violent and disruptive behavior; his heightened security risk, given he was accused of murder; and his threatening behavior on numerous occasions while in the contested administrative detention, including his use of a stainless steel shower panel to threaten staff and his possession of a hidden razor blade in his cell—obviously for means of using it as a weapon.

Most recently, the Eighth Circuit has held that an inmate's confinement in a maximum security facility for five years did not implicate a liberty interest because the inmate failed to allege that the conditions in that facility constituted an atypical and significant hardship.  The Court stated:

> Without a description of the conditions of confinement while in segregation, we are left with our precedent "that demotion to segregation, even without cause, is not itself an atypical and significant hardship." *Phillips*, 320 F.3d at 847.
>
> Smith also cites his loss of employment, wages, security classification, security points, and inmate tier status upon his transfer to the ISP. But none of these losses, individually or collectively, amounts to an atypical and significant hardship under our precedent. *See, e.g.*, *Freitas*, 109 F.3d [1335] at 1338 [8th Cir. 1997] (concluding that inmate's "loss of a higher-paying job and other privilege" did not "constitute[ ] an atypical hardship"); *Blankenship*, 100 F.3d [640] at 642 n.2 [8th Cir. 1996] (concluding that inmate's loss of "the privilege of working and the accompanying good time credits" while in punitive isolation did not constitute an atypical hardship).

*Smith v. McKinney*, No. 18-3613, 2020 WL 1522492, at *6 (8th Cir. Mar. 31, 2020).

In this case, Fritts was initially placed into administrative segregation at the EARU on October 9, 2012, and remained in either administrative segregation or

---

Thus, while his administrative detention was longer than other instances this court has considered and arguably atypical in duration, the fact it was commensurate with ongoing security concerns and a pending investigation, during which time Mr. Jordan did not experience atypical conditions or restrictions, provides sufficient extenuating circumstances to convince us no liberty interest was implicated.

191 F. App'x at 653.

punitive isolation until February 9, 2017, for a total of 1584 days or four years and four months.  Of that time, Fritts was sentenced to a total of 333 days in punitive isolation (he received 11 disciplinary convictions with each carrying a 30-day punitive isolation sentence).  The Court finds that significant.  This case is a challenge to the time Fritts spent in administrative segregation, not punitive isolation.  Fritts does not challenge those disciplinary infractions or the due process he received in connection with those disciplinaries in this case.  Nevertheless, given the facts presented in this case and the lack of any controlling caselaw on this particular issue,[28] the Court need not determine whether the punitive time should be subtracted from the total time Fritts spent outside general population.[29]  Whether the period was three years or four, the conditions Fritts faced in VSM's administrative segregation were not harsh enough to implicate a liberty interest, as explained below.

While three to four years in administrative segregation is certainly significant and potentially atypical depending on the circumstances, the time period alone does not equate to an atypical and significant hardship as contemplated by *Sandin*.  The Court must also examine the conditions that Fritts endured while he was in

---

[28] *Chestang*, 496 Fed. Appx. 684, *supra,* and *Williams v. Norris*, 277 F. App'x 647, *supra,* hold that separate consecutive administrative segregation sentences in different programs or prisons should be aggregated to determine if a liberty interest is implicated. Neither case involved intermittent sentences to punitive isolation.

[29] The Court notes that Fritts' time in segregation in between disciplinary convictions ranged from approximately 78 days to 318 days according to his status assignment sheet (Exhibit P).

administrative segregation and compare those to the conditions in the general population. The defendants submitted a copy of the administrative policy which sets forth the privileges that inmates assigned to segregation are entitled to (Exhibit H, Doc. No. 110-5). The defendants also provided an affidavit by Warden Watson describing how administrative segregation differs from the general population at VSM. Those show that inmates are provided their basic needs such as meals, clothing, showering, laundry services, and medical/dental services. The inmates are typically allowed five hours of exercise per week which takes place outside if weather permits. The inmates may make commissary purchases and have access to mail, reading materials, and legal materials. The inmates are allowed visitation and may receive visits from chaplains on request.

Fritts provided a sworn declaration describing the conditions inside administrative segregation and the general population. He does not maintain that he was not allowed the privileges afforded by policy while housed in administrative segregation with one possible exception. He states that he never received a visit from a chaplain – however, Fritts does not state that he ever requested one. The crux of Fritts' complaint about administrative segregation is that he was alone there and not able to move freely around other inmates. Fritts generally complains that he was mostly confined to his cell, taking meals there and showering there, and was only allowed outside for recreation time. He also did not like the outside recreation area,

complaining that it was mosquito- and bird-infested with little sunlight. Fritts noted that prisoners in administrative segregation must be handcuffed and shackled whenever they leave their cells. Furthermore, while it may have been more enjoyable to be in the general population with other inmates, Fritts was not completely isolated in administrative segregation. The record shows that Fritts had access to mail, email, telephone, and visitation, but repeatedly lost those privileges due to the disciplinaries he received. Some of those disciplinaries were in fact for misuse of the mail, email, and phone system.

The Court finds that the conditions Fritts endured in administrative segregation were not so dramatically different from those in the general population as to constitute an atypical and significant hardship. While he was unable to socialize with other inmates on a regular basis, he was not completely isolated from others and all his basic needs were met.

Moreover, much like the inmate in *Jordan*, Fritts posed a significant security risk necessitating that he be kept away from other prisoners in general population. Both Classification Officer Washington and Warden Watson testified that they and the Committee were well aware of Fritts' violent history, significant gang activity, suspected leadership roles within the Aryan Circle, various inmate precautions related to gang activity, and multiple disciplinaries related to violent gang activity. Fritts had previously stabbed an ADC prison guard and another

inmate at the Sebastian County jail.  He was also accused of having a homemade knife and directing that other inmates be beaten, stabbed, or given laced pills while he was housed in administrative segregation.  These legitimate security concerns warranted that Fritts be confined in more restrictive quarters.  Given these security concerns and the fact that the conditions in administrative segregation were not unduly harsh, the Court finds that Fritts' liberty interests were not implicated by his stay in administrative segregation.

Finally, even if this Court found that Fritts' four-year stay in either administrative segregation or punitive isolation constituted an atypical and significant hardship, the defendants are still entitled to qualified immunity.  There is no caselaw holding that a four-year stay in administrative segregation necessarily constitutes an atypical and significant hardship.  As explained above, *Chestang* does not stand for that proposition, and the Tenth Circuit Court of Appeals has found that a five-year stay in segregated confinement was not atypical and significant given the conditions described in that case.  *See Jordan v. Fed. Bureau of Prisons*, 191 Fed. Appx. 639, *supra*.  *See also Smith v. McKinney*, No. 18-3613, 2020 WL 1522492, at *6 (8th Cir. Mar. 31, 2020), *supra* (decided after this case was filed).  Accordingly, it is not "clearly established" that a four-year stay in segregated confinement necessarily constitutes an atypical and significant hardship.  Based on the state of the caselaw, then, defendants were not on notice,

and thus did not have "fair warning," that Fritts' four-year confinement in both administrative segregation and punitive isolation might constitute an atypical and significant hardship sufficient to establish a liberty interest given that the conditions were not dramatically different than those in the general population.

Accordingly, the defendants are entitled to qualified immunity under both prongs of the qualified immunity analysis. They should be awarded summary judgment on Fritts' due process claims, and the Court need not determine whether Fritts' administrative segregation reviews were meaningful.

### B.    *Equal Protection Claim*

Fritts claims that his equal protection rights were violated because other gang-affiliated inmates, including those with serious disciplinary violations, were returned to VSM's general population while he was kept in administrative segregation for more than four years. Doc. No. 1 at 5; Doc. No. 19 at 3. Fritts estimates that 60-70% of the ADC prison population is gang-affiliated. Doc. No. 1 at 5. However, Fritts acknowledges he has no way of specifically identifying those inmates because he was kept in administrative segregation the entire time he was incarcerated at VSM. Doc. No. 125 at 20. The defendants argue they are entitled to summary judgment on this claim because Fritts cannot show that similarly situated inmates were treated more favorably than him.

An inmate bringing an equal protection claim must show intentional or purposeful discrimination. *Klinger v. Dep't. of Corr.,* 31 F.3d 727, 733 (8th Cir. 1994). "The heart of an equal protection claim is that similarly situated inmates were treated differently and that this difference in treatment bore no rational relationship to any legitimate penal interest." *Weiler v. Purkett,* 137 F.3d 1047, 1051 (8th Cir. 1998) (citing *Timm v. Gunter,* 917 F.2d 1093, 1103 (8th Cir. 1990)). To survive summary judgment, Fritts must "identify the characteristics of the class he claims to be similarly situated to and present some evidence that other groups with the class were not also restricted in similar ways." *Murphy v. Missouri Dep't of Corr.,* 372 F.3d 979, 984 (8th Cir. 2004) (citing *Rouse v. Benson*, 193 F.3d 936, 942–43 (8th Cir. 1999)).

Fritts' conclusory allegation that 60-70% of the ADC's general prison population is gang-affiliated and that some of those inmates have received "serious disciplinary infractions" is insufficient to defeat summary judgment. Fritts is required to come forward with evidence of similarly situated inmates who were treated more favorably. *See e.g., Rouse v. Benson*, 193 F.3d 936, 942-43 (8th Cir. 1999) (rejecting a Native American inmate's equal protection claim because he made "ambiguous allegations" of religious discrimination and failed to "discern the contours of the class to which he would claim to be similarly situated"); *Runningbird v. Weber*, 198 Fed. Appx. 576, 578 (8th Cir. 2006) (unpublished opinion) (holding

that a Native American inmate's "general verified allegations about other religious groups being treated more favorably are not sufficiently specific to support an equal protection claim").

Furthermore, even if Fritts is correct that a large percentage of the general population at VSM is gang-affiliated, he has not shown that those inmates are similarly situated to him. The record in this case shows that Fritts had numerous separation alerts and precautions specifically related to gang activity. *See* Exhibit C. One of those precautions describes Fritts as "the highest ranking Aryan Circle member in Arkansas." *Id.* at 12. He also received numerous disciplinaries accusing him of engaging in gang activity while housed in administrative segregation. *See* Exhibit B. The evidence in this case makes clear that Fritts was not just gang-affiliated but believed to be the leader of the Aryan Circle and actively involved in gang activity. Fritts has not specifically named or described any inmates with similar attributes who were allowed to remain in general population at VSM. Because Fritts cannot prove that he was systematically and intentionally treated differently than similarly situated inmates, his equal protection claim fails and defendants are entitled to judgment as a matter of law on this claim.

### C.   *Conditions of Confinement Claim*

Fritts' Eighth Amendment claim is premised on the allegation in the addendum to his amended complaint that the defendants placed him in great danger

by instructing him to renounce his gang affiliation in order to obtain release to the general population. *See* Doc. Nos. 40, 45 & 46. Because this allegation was not developed in the defendants' motions for summary judgment, the undersigned requested that the parties clarify this claim. Fritts has since clarified that he asserts an Eighth Amendment violation based on his allegation that the defendants told him he could be released from administrative segregation if he renounced his gang affiliation. Doc. No. 139 at 12-13.

An inmate has a constitutional right to be free from attacks by other inmates. *See Robinson v. Cavanaugh*, 20 F.3d 892 (8th Cir. 1994). A correctional officer is liable for failing to protect an inmate if the inmate can make the following two-part showing:

> A correctional official "violates the Eighth Amendment if he is deliberately indifferent to the need to protect an inmate from a substantial risk of serious harm from other inmates." *Jackson v. Everett*, 140 F.3d 1149, 1151 (8th Cir. 1998). "A failure-to-protect claim has an objective component, whether there was a substantial risk of harm to the inmate, and a subjective component, whether the prison official was deliberately indifferent to that risk." *Curry v. Crist*, 226 F.3d 974, 977 (8th Cir. 2000). To be liable, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). . . .

*Jones v. Wallace*, 641 Fed. Appx. 665, 666 (8th Cir. 2016).

While Fritts alleges in the addendum to his complaint (Doc. No. 46) and in his supplemental response (Doc. No. 139 at 13) that the defendants required him to

renounce any STG or gang membership and "debrief" in order to leave administrative segregation, he does not make this allegation in his sworn declaration.

Also, the defendants dispute this allegation. Washington and Warden Watson both submitted affidavits stating that they never told Fritts he had to renounce his gang affiliation to be released from administrative segregation. They also state that numerous gang-affiliated inmates are not held in administrative segregation. Furthermore, none of the administrative segregation reviews reflect that the Committee made this demand on Fritts. The record in this case makes clear that Fritts was held in administrative segregation because he was believed to be heavily involved in gang activity and engaged in criminal activity such as directing attacks on other inmates. Fritts' bare allegation that the defendants required him to renounce his membership in a gang in order to be released from administrative segregation is unsubstantiated and insufficient to defeat summary judgment.

Finally, even if there is a fact issue as to whether or not defendants made such a demand, there is no evidence that Fritts in fact renounced gang citizenship, thereby placing himself in danger. Fritts makes only general and speculative allegations that he would be at risk from other inmates *if* he were to renounce his gang affiliation, which he did not do. This claim is insufficient to establish a constitutional violation.

## IV.  Conclusion

The defendants are entitled to qualified immunity as to Fritts' individual capacity claims for the reasons stated herein.   Accordingly, the undersigned recommends that the defendants' motions for summary judgment (Doc. Nos. 107, 110 & 114) be granted, and this case be dismissed with prejudice.

DATED this 14th day of April, 2020.

_____

UNITED STATES MAGISTRATE JUDGE